## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 24-cr-209-BAH** |
| **DUSTIN RAY WILLIAMS** | |
| Defendant. | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Dustin Ray Williams to 30 months of incarceration, 3 years of supervised release, restitution in the amount of $2,000, and a $295 mandatory assessment fee. Based on the government's calculation, Williams' guidelines range is 27 to 33 months. The government's recommendation of 30 months, at the midpoint of that guidelines range, is warranted to reflect the seriousness of Williams' conduct on January 6 while acknowledging his early acceptance of responsibility.

### I.    INTRODUCTION

The defendant, Dustin Williams, violently participated in the January 6, 2021 riot at the United States Capitol that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured

1

more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Williams, the owner of a custom concrete fixture business, joined the riotous mob that breached the Capitol grounds, waded to the front of the crowd on the southern end of the West Terrace, and immediately assaulted the officers defending the Capitol by forcibly shoving and pushing the officers over a period of approximately 25-30 seconds. Minutes later, Williams stood near the police line, surrounded by thousands of rioters, and threateningly shouted, "There's a lot more coming, motherfuckers!" Williams made a number of selfie videos while on the U.S. Capitol grounds, explaining in some that he had been "pepper sprayed" and "tear gassed." Instead of leaving, however, Williams remained within the restricted area for approximately two additional hours. When the police line on the West Plaza retreated up to the inaugural platform and through a tunnel that led into the U.S. Capitol building, Williams followed and stood just outside the tunnel entrance.

The government recommends that the Court sentence Williams to 30 months of incarceration for his conviction of violating

- 18 U.S.C. § 231(a)(3) [Count One – Civil Disorder],

- 18 U.S.C. § 111(a) [Count Two – Assaulting Federal Officers],

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

- 18 U.S.C. § 1752(a)(1) [Count Three – Entering/Remaining on Restricted Grounds],

- 18 U.S.C. § 1752(a)(2) [Count Four – Disorderly/Disruptive Conduct on Restricted Grounds],

- 18 U.S.C. § 1752(a)(4) [Count Five – Physical Violence on Restricted Grounds],

- 40 U.S.C. § 5104(e)(2)(D) [Count Six – Disorderly Conduct on Capitol Grounds], and

- 40 U.S.C. § 5104(e)(2)(F) [Count Seven – Physical Violence on Capitol Grounds].

A 30-month sentence reflects the gravity of William's conduct, but also acknowledges his early admission of guilt.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case as part of the Joint Status Report (ECF 34 at 6-10) as well as the Statement of Facts filed in support of the complaint application (ECF 1-1 at 1-2) for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    Williams's Role in the January 6, 2021 Attack on the Capitol

#### *Approach to the Capitol and Entry onto Restricted Grounds*

Dustin Williams, the owner of a custom concrete fixture business, drove from his home in Texas and participated in the January 6 attack on the U.S. Capitol. Williams entered the restricted grounds and violently assaulted federal officers defending the Capitol, interfering with their sworn duty to protect members of Congress and their staff. His crimes were captured in a series of videos provided to the FBI by concerned citizens, open-source videos, and surveillance

3

footage from outside of the U.S. Capitol.

The day before the assault at the Capitol, Williams drove to Washington, D.C. from Brady, Texas. On January 6, Williams attended then-President Trump's rally at the Ellipse on January 6. After leaving the rally, he walked to the U.S. Capitol grounds and entered the restricted area by no later than 1:03 p.m.—just minutes after other rioters first breached the restricted perimeter surrounding the Capitol building. Once there, Williams walked behind the crowd of rioters located along the West Plaza and past the media tower towards the south side of the plaza.

### *Williams' Assault on Federal Officers*

By that time, United States Capitol Police (USCP) and Metropolitan Police Department (MPD) officers (wearing jackets identifying themselves as law enforcement officials and some of whom were carrying riot helmets and riot shields) stood in a line to defend the U.S. Capitol building, members of Congress and their staffs, and the U.S. Secret Service detail protecting former Vice President Pence. The line of police officers, standing shoulder to shoulder on an elevated platform, faced east towards the growing riotous mob that had flooded the West Plaza.

Rioters forcibly and violently clashed with police officers there, especially towards the southern end of the police line. Williams, wearing a hat and a distinctive orange t-shirt, waded through the growing mob in order to reach the front and to confront the police officers defending the Capitol. Standing directly in front of those USCP officers, Williams began to violently shove and push them for a period of approximately 25-30 seconds. During that time, police officers attempted to defend themselves from Williams and other rioters, but Williams continued to

grapple with officers and to grab their arms and riot shields. *See Images 1-4*.



*Image 1: Still from Video Exhibit 1 showing Williams violently assaulting police officers at approximately 1:05 p.m.*



*Image 2: Still from Video Exhibit 1 showing Williams violently assaulting police officers at approximately 1:05 p.m.*



*Image 3: Still from Video Exhibit 1 showing Williams violently assaulting police officers at approximately 1:06 p.m.*



*Image 4: Still from Video Exhibit 1 showing Williams violently assaulting police officers at approximately 1:06 p.m.*

Video footage from the U.S. Capitol surveillance system also captured Williams's approach from the middle of the riotous mob to the front where he confronted and assaulted police officers on the West Plaza. *See Images 5-6.*



*Image 5: Still from Video Exhibit 2 showing Williams walking towards police line at approximately 1:05 p.m.*



*Image 6: Still from Video Exhibit 2 showing Williams walking towards police line at approximately 1:05 p.m.*

### *Additional Conduct at the U.S. Capitol*

Shortly thereafter, having physical clashed with the police officers, Williams stood near

the police line surrounded by thousands of other rioters and threateningly shouted, "There's a lot

more coming, motherfuckers!" His shout was captured on a video. *See* Exhibit 3; PSR ¶20.



*Image 7: Still from Video Exhibit 3 showing Williams shouting threats at the police line.*

While still on the West Plaza, Williams recorded himself in a selfie video that he posted to Facebook, describing that he had been "pepper sprayed" and "tear gassed." Exhibit 4. In the same video, Williams asked a friend to show off a police baton the friend had taken from a police officer. *Id.* Video evidence confirms that Williams was hit with pepper spray. Exhibit 1; PSR ¶19. Nonetheless, Williams did not leave the U.S. Capitol grounds. Instead, he remained within the restricted area for approximately two additional hours and made multiple selfie videos

that he posted to Facebook describing where he was and what he was doing.



*Image 8: Still from Video Exhibit 4 in which Williams describes being "pepper sprayed" and "gassed" and recorded while Williams remained on the West Plaza.*

During that period, the vastly outnumbered line of police officers had retreated up to the

Lower West Terrace and through the tunnel that led into the U.S. Capitol building. Williams and

12

the rest of the riotous mob followed, ascending from the West Plaza to the Lower West Terrace, where he remained just outside of the tunnel entrance of the U.S. Capitol. Williams recorded yet another selfie video from near the tunnel, explaining that there was "gas in the air" and expressing his reluctance to leave. Then, when cheers from the mob caught his attention, he looked towards the tunnel and shouted in celebration, "I think we got in!" and turned his camera to capture the moment. Exhibit 5.



*Image 9: Still from Video Exhibit 5 in which Williams celebrates his belief that rioters breached*

*the Capitol building through the Lower West Terrace Tunnel.*

Towards the end of the video, Williams explained that he supported the mob's efforts to enter the Capitol building, explaining, "We're here to get in." *Id.*

### Williams' Statements After Leaving the U.S. Capitol

After leaving the Capitol grounds that day, Williams made another selfie video in which he acknowledged his role in assaulting police officers defending the U.S. Capitol, stating "[w]e were part of the initial . . . we were the very first assault through the riot police." He further stated, "I was part of an initial assault there, I got tear gassed, well I got pepper sprayed first, uh, right in the face actually, that was terrible by the way, super terrible, but then uh we got hit with CS gas, tear gas." Exhibit 6.

The following day, January 7, 2021, Williams drove back to Texas from Washington, D.C. Along the way, he made and posted yet an approximately 30-minute long video to Facebook. Over the course of the video, Williams blamed Antifa—whom he claimed dressed up as pro-Trump protestors—for the instigating the violence and destruction he observed at the Capitol while acknowledging that it was not his first time having a "run-in" with Washington, D.C., riot police.

### III.    THE CHARGES AND OPEN PLEA

On May 1, 2024, a federal grand jury returned an indictment charging Williams with the seven counts identified above on pages 2 to 3 of this memorandum. Williams was convicted of those offenses based on a guilty plea, without a plea agreement, to each of the seven charges.

IV.    **STATUTORY PENALTIES**

Williams now faces sentencing on each of the seven charges of conviction. The Presentence Report identifies the maximum penalties for each of those offenses. *See* PSR ¶¶ 114-120 (custodial terms), 122-25 (supervised release), and 141-146 (fines and special assessments).

V.    **THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS**

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

A.  Sentencing Guidelines Calculation

The government submits that the Guidelines analysis of all of the Counts to which Williams pleaded guilty are as follows, as set forth in the Joint Status Report filed on July 2, 2024 (ECF 34 at 10-11):

(1) *Count One: Civil Disorder, 18 U.S.C. § 231(a)(3)*
    Base offense level: U.S.S.G. § 2A2.4(a):               10
    Physical contact: U.S.S.G. § 2A2.4(b)(1)(A):           +3
    U.S.S.G. § 2A2.4(c) Cross Reference Applies
    Base offense level: U.S.S.G. § 2A2.2(a):               14
    Official victim, U.S.S.G. § 3A1.2(b)                   +6
                                        **Total Offense Level: 20**

(2) *Count Two: Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1)*

    Base Offense Level: U.S.S.G. § 2A2.4                   10
    Physical contact: U.S.S.G. § 2A2.4(b)(1)(A):           +3
    U.S.S.G. § 2A2.4(c) Cross Reference Applies
    Base offense level: U.S.S.G. § 2A2.2(a)                14
    Official victim, U.S.S.G. § 3A1.2(a), (b)              +6
                                        **Total offense level: 20**

(3) *Count Three: Entering and Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1)*

| | |
|---|---|
| Base Offense Level: U.S.S.G. § 2B2.3(a) | 4 |
| Restricted Grounds: U.S.S.G. § 2B2.3(b)(1)(vii): | +2 |
| U.S.S.G. § 2B2.3(c) Cross Reference Applies | |
| Base offense level: U.S.S.G. § 2A2.2(a) | 14 |
| **Total offense level: 14** | |

(4) *Count Four: Disorderly and Disruptive Conduct in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(2)*

| | |
|---|---|
| Base Offense Level: U.S.S.G. § 2A2.4 | 10 |
| Physical contact: U.S.S.G. § 2A2.4(b)(1)(A): | +3 |
| U.S.S.G. § 2A2.4(c) Cross Reference Applies | |
| Base offense level: U.S.S.G. § 2A2.2(a) | 14 |
| **Total offense level: 14** | |

(5) *Count Five: Engaging in Physical Violence in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(4)*

| | |
|---|---|
| Base Offense Level: U.S.S.G. § 2A2.4 | 10 |
| Physical contact: U.S.S.G. § 2A2.4(b)(1)(A): | +3 |
| U.S.S.G. § 2A2.4(c) Cross Reference Applies | |
| Base offense level: U.S.S.G. § 2A2.2(a) | 14 |
| Official victim, U.S.S.G. § 3A1.2(a), (b) | +6 |
| **Total offense level: 20** | |

(6) *Count Six: Disorderly Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D)*
Because this is a Class B misdemeanor, the Guidelines do not apply. *See* 18 U.S.C. § 3559; U.S.S.G. § 1B1.9.

(7) *Count Seven: Act of Physical Violence in the Capitol Grounds or Building, 40 U.S.C. § 5104(e)(2)(F)*
Because this is a Class B misdemeanor, the Guidelines do not apply. *See* 18 U.S.C. § 3559; U.S.S.G. § 1B1.9.

B. <u>Grouping</u>

Based on this Court's analysis in *United States v. Todd*, 1:22-CR-00166-BAH,[2] Counts One, Two, and Five (charging violations of 18 U.S.C. §§ 231, 111, and 1752(a)(4), "Group 1") group pursuant to Section 3D1.2(b) because they involve the same victim (law enforcement). The highest offense level for Group 1 is 20. Counts Three and Four (charging violations of 18 U.S.C. § 1752(a)(1) and (a)(2)) are in a separate group ("Group 2") because the victim of both of those offenses is Congress. Group 2 does not group with Group 1 because they involve separate and distinct harms to separate and distinct victims. The highest offense level for Group 2 is 14. One unit is assigned to the group with the highest offense level (here, Group 1). Group 2 is six levels less serious than the highest offense level for Group 1; accordingly, it is assigned one-half

---

[2] Todd was convicted by a jury of obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2), aggravated assault of police officers in violation of 18 U.S.C. § 111(a) and (b), entering and remaining in a restricted area in violation of 18 U.S.C. § 1752(a)(1), disorderly and disruptive conduct in a restricted area in violation of 18 U.S.C. § 1752(a)(2), and two petty offenses. 22-cr-166 (BAH), May 31, 2024 Sent'g Transcript at 3-4. Although this Court did not disagree with the government's argument that the § 1752(a)(1) and § 1752(a)(2) convictions involved the same victim (Congress), it held that those counts did not group in and rejected the government's argument to the contrary. Rather, the Court held that the § 1752(a)(2) count grouped with the assault conviction pursuant to U.S.S.G. § 3D1.2(c) because the government had argued that the assault "embodied conduct that is treated as a specific offense characteristic" of the offense level for the § 1752(a)(2) count. *Id.* at 41-42.

Here, by contrast, the government does not take the position here that the offense level for the § 1752(a)(2) is increased by any specific offense characteristics. Rather, it argues that the offense level for that count is the base offense level of 14 only. Accordingly, the § 1752(a)(1) and § 1752(a)(2) counts group together in Group 2 pursuant to U.S.S.G. § 3D1.2(b) (same victim), and § 1752(a)(2) does *not* group with the other counts in Group 1 pursuant to U.S.S.G. § 3D1.2(c). In any event, whether the § 1752(a)(1) and § 1752(a)(2) counts group together here does not impact the offense level of Group 2: the offense level for both counts is 14, and whether Group 2 consists of the 1752(a)(1) count alone or both the 1752(a)(1) and 1752(a)(2) counts, the offense level for Group 2 remains 14.

unit. The two groups combine for a total of 1½ units, resulting in an increase of one offense level for a combined adjusted Offense Level of 21.

The government submits that the revised PSR includes two (related) errors.

*First*, the PSR erroneously calculated the adjusted offense level for Count Three [Entering and Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1)] as 6, instead of 14. While the government agrees with the PSR that the initial base offense level for Count Three is 4 based on U.S.S.G. § 2B2.3 (trespass), and then increased by two levels to 6 pursuant to U.S.S.G. § 2B2.3 (trespass occurring in a restricted building/grounds), the calculation does not end there. Rather, the cross reference pursuant to U.S.S.G. § 2B2.3(c)(1) (offense committed with intent to commit a felony) also applies to Williams's conduct, resulting in an adjusted offense level of 14 pursuant to U.S.S.G. § 2X1.1(a) (base offense level from guideline for substantive offense) and U.S.S.G. § 2A2.2(a) (base offense level). The government submits that the cross reference at § 2B2.3(c)(1) is applicable here because Williams entered and remained within the restricted area of the Capitol grounds with the intent to commit one or more felony offenses, including Civil Disorder (Count One) and Assault on a Federal Officer (Count Two).

In response to this objection, the revised PSR states as follows:

> Probation maintains the cross reference at § 2B2.3(c)(1) is not applicable. There does not appear to be any evidence that defendant Williams entered and remained in a restricted area of the U.S. Capitol *for the purpose of* assaulting law enforcement officers who were engaged in in the lawful performance of official duties during a civil disorder.

PSR p.26-27 (emphasis in original).

The government respectfully disagrees. Williams entered onto the restricted grounds by no later than 1:03 p.m., knowing that he lacked authority to be there. PSR ¶18. Having done so, Williams then walked behind a crowd of rioters along the West Plaza and past the media tower towards the south side of the plaza. *Id.* From there, police officers wearing uniforms and carrying riot helmets and shields visibly stood in a line to defend the Capitol building and protect its lawful occupants. *Id.* Immediately thereafter, at approximately 1:05 p.m., Williams pushed his way through the riotous crowd directly towards those police offices, remaining on restricted grounds in order to do so. *See* Exhibit 2.

Reaching the front of the mob, he immediately confronted the officers there and seconds later, assaulted them. *See* Exhibits 1 and 2; PSR ¶18. For the next 25-30 seconds, William's assault on the officers obstructed, impeded, and interfered with them while they were attempting to protect the Capitol. *Id. By at least that time*, Williams had entered into and remained within restricted grounds intending to assault the officers keeping him from moving closer to and entering within Capitol. Likewise, *by at least that time*, Williams had remained on restricted grounds in order to impede, obstruct, and interfere with the efforts of officers working to keep unauthorized rioters like Williams out of the Capitol building.

That Williams may not have intended to commit those felonies when he first entered the restricted area does not preclude operation of the cross-reference. If other conditions exist, a person violates § 1752(a)(1) if they "knowingly enter[] ***or remain[]*** in any restricted building or grounds" 18 U.S.C. § 1752(a)(1) (emphasis added). By remaining in the restricted area while

assaulting police and impeding their efforts to respond to a civil disorder, Williams intended to commit another felony while he was violating § 1752(a)(1).

As Exhibit 5 makes clear, Williams supported the riotous mob's efforts to enter the Capitol building (explaining, "We're here to get in") and excitedly celebrated what he understood to be the crowd's success in entering. This evidence demonstrates that, at the very least, Williams entered into or remained on restricted grounds in order to assault and impede the efforts of those officers trying to stop the mob from doing so. Accordingly, the government submits that the cross-reference at § 2B2.3(c)(1) applies here and the total offense level for Count Three is 14.

*Second*, and relatedly, because (1) the offense level for Count Three is 14, the highest offense level for Group 2 is 14 (not 6); (2) the highest offense level for Group 1 is 20; and (3) Count Three does not group with Group 2 because it involves a separate victim, the groups combine for a total of 1½ units resulting in a combined adjusted Offense Level of 21 (and not 20). ECF 34 at 11; PSR p.26-27. Furthermore, in the Joint Status Report, Williams took the position that even if the offense level for Count Three is 14 rather than 6, the combined adjusted Offense Level remains 20 (and not 21) because Group 2 groups with the Group 1. ECF 34 at 11-12. The government respectfully disagrees for the reasons set forth above and described in *United States v. Todd*, 1:22-CR-00166-BAH.

C.  Undisputed Inapplicability of 4C1.1

The U.S. Probation Office determined that Williams is not eligible for the Zero-Point Offender Adjustment pursuant to U.S.S.G. § 4C1.1(a)(3), because Williams used violence or

credible threats of violence in connection with the offense. PSR ¶58. For the reasons set forth below, the government agrees. Williams did not object to this determination.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 does not apply in this case because Williams used violence and credible threats of violence against police officers under a totality of the circumstances. Williams has pleaded guilty to assaulting federal officers pursuant to 18 U.S.C. § 111(a). His assault on federal officers is documented in Exhibits 1 and 2. Moreover, Williams threatened those officers after his assault, as documented in Exhibit 3 ("There's a lot more coming, motherfuckers!"), at time when Williams reasonably understood the volatility of the situation on the West Plaza when police officers were already heavily outnumbered by members of the riotous mob. *See United States v. Andrulonis*, No. 23-cr-085 (BAH), Sentc'g Hrg. Tr. at 11-12.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the

same sentence regardless of whether § 4C1.1 applies.[3]

    D.  <u>The Government's Calculated Sentencing Range for Williams</u>

The U.S. Probation Office calculated Williams' criminal history as category I, which is not disputed. PSR ¶ 62. Accordingly, the government's calculation of Williams' total adjusted offense level, after acceptance of responsibility, is 18. The resulting sentencing guidelines range is therefore **27 to 33** months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, William's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.

Williams arrived at the U.S. Capitol grounds within minutes of the initial breach of the restricted perimeter and wasted little time in moving to the front of the mob in order to violently assault police officers defending the building on the West Plaza. Video evidence shows Williams pushing, shoving, and grappling with a number of officers over a period of 25-30 seconds, only

---

[3] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

stopping after he was sprayed in the face with pepper spray. Williams nonetheless stayed in the West Plaza, shouting threats at the officers, before pushing forward with the mob that sought to enter the building through the "Tunnel." The nature and circumstances of Williams's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 30 months.

### B.  Williams' History and Characteristics

Williams reported having had a "great" childhood and a supportive family. PSR ¶¶70-71.  He has been married and divorced twice and has two children, neither of whom currently resides with him.  PSR ¶¶72-73; 77. Williams owns a custom concrete business ("Crete Builders, LLC") that performs decorative concrete work. ECF 34 at 8; PSR ¶¶98-99; 104. He also works as an independent contractor and has averaged $60,000 in annual income over the past two years. PSR ¶98. Previously, Williams worked for his stepfather's concrete company. PSR ¶101. In May 2010, Williams enlisted in the U.S. Army and completed two years in infantry. PSR ¶103. During that period, he was deployed to Iraq in 2011 for eleven months. PSR ¶103. Williams has no prior arrests or convictions. PSR ¶¶ 61-65.

Despite the advantages of steady employment and a supportive family, Williams nonetheless left Texas and drove 1,500 miles to Washington, D.C., not even waiting for the end of former-President Trump's speech at the Ellipse to breach the Capitol grounds and assault police officers there. If anything, such factors highlight that Williams had choices other than engaging in violent criminal conduct on January 6. And while Williams's past military service is commendable, and the government's sentence recommendation takes that service into account,

his willingness to violently assault police officers merely doing their job to defend the Capitol was a betrayal of his enlistment oath.

According to the U.S. Probation Office, Williams did not provide documentation of his finances. ¶106. He also failed to complete a Net Worth Statement, and through counsel ownership of any assets of liabilities, PSR ¶ 107, and did not provide income tax documents. ¶112. These failures are particularly concerning in light of the U.S. Probation Department's determination that despite a positive monthly cash flow, Williams currently owes over $27,000 to the Texas Attorney General for overdue child support. ¶¶73; 110-11. Williams' history and characteristics weigh in favor of a significant term of incarceration.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Williams's criminal conduct on January 6 was the epitome of disrespect for the law. "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20.

### D. The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. At the time Williams assaulted police officers defending the U.S. Capitol, he was himself a former U.S. soldier. Despite his oath to the Constitution, and his years of training and experience in the military, Williams did not hesitate to rush towards police officers attempting to do their job and fulfill their sworn obligation to defend the U.S. Capitol, members of Congress and their staff, and then Vice President Pence and the U.S. Secret Service officers assigned to protect him. Even after assaulting multiple police officers, Williams remained on the West Plaza and shouted threats at the officers—threats backed by the large and growing crowd of rioters who had demonstrated their willingness to attack the police line. *See* Exhibit 3.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

**F.    Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may

emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[6] While no previously sentenced case contains the same balance of aggravating and mitigating

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Williams's conduct on January 6 is comparable to that of *United States v. Cale Clayton*, 22-cr-00139 (RCL). Like Williams, Clayton attended then-President Trump's rally at the Ellipse and entered onto the restricted grounds on the west side of the Capitol building. Like Williams, Clayton threatened and harassed the officers defending the Capitol ("We are going to win. You don't have enough for all of us. You might hit me once or twice. You might spray me with pepper spray. I don't give a fuck. There ain't enough for millions of people here and you know it."). 22-cr-00139 ECF 32 at 4. As officers attempted clear rioters from the west side, Clayton assaulted multiple officers by shoving them and grabbing their shields. And while Williams did not take an officer's baton, as Clayton did, one of William's fellow travelers from Texas did—a fact that Williams proudly announced and broadcast on Facebook. *See* Exhibit 4. When officers demanded Clayton return the baton, he shoved another officer in the face and grabbed his face mask. Neither Williams nor Clayton entered the U.S. Capitol building. Clayton, unlike Williams, pleaded guilty to two separate violations of 18 U.S.C. § 111(a), and as a result, had a higher offense level (19) and thus a slightly higher calculated sentencing guidelines range (30-37 months). Judge Lamberth sentenced Clayton to 30 months of incarceration, a sentence consistent with the government's recommendation in this case.

Williams's conduct is likewise comparable to that of *United States v. James Weeks*, 24-cr-131 (BAH), whom this Court recently sentenced to a period of 27 months of incarceration. Unlike Williams, who pleaded guilty to violations of 18 U.S.C. § 231 (another felony) in

addition to 18 U.S.C. § 111(a), Weeks pleaded guilty to a single count of violating 18 U.S.C. § 111(a). As a result, his calculated offense level (17) was lower than that of Williams and thus had a lower sentencing guidelines range (24-30 months' imprisonment). While Weeks assaulted officers in the "tunnel" on the Lower West Terrace, the location of some of the most violent conduct on January 6, that assault took place almost two hours after Williams's assault of officers on the West Terrace. While Weeks's actions at the doorway in the tunnel constituted an aggravating factor, so too does the fact that Williams participated in one of the very first assaults against officers at the Capitol on January 6—an assault that paved the way for what followed and helped to normalize the use of violence against such officers. A sentence of 30 months' incarceration for Williams is consistent with the sentence this Court imposed on Weeks.

## VII.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal

cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). As Williams was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019)

(quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[7]

Because Williams in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold Williams responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Williams to pay $2,000 in restitution for his convictions on Counts One through Five. This amount fairly reflects Williams's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have

---

[7] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity. *See United States v. Todd*, 22-cr-166 (BAH) ECF 247 (Memorandum and Order).

## VIII.   FINE

Williams' convictions for violations of 18 U.S.C. §§ 111(a) and 231 subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider William's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on Williams to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, Williams has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e).

## IX.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a

sentence of 30 months of incarceration, 3 years of supervised release, restitution in the amount of $2,000, and a $295 mandatory assessment fee.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:

Craig Estes
Assistant U.S. Attorney