IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 24-cr-209 (BAH) |
| | ) | |
| DUSTIN RAY WILLIAMS, | ) | |
| | ) | |
| Defendant. | ) | |

**SENTENCING MEMORANDUM**

Dustin Wiliams submits the following memorandum in support of his request for a significantly below the advisory guideline range of 24 to 30 months.  (PSR ¶ 118).   While significant, Mr. Williams' actions on January 6, 2021, coupled with his history and characteristics, do not warrant a guideline sentence.

*Nature and Circumstances of the Offense*

Mr. Williams does not attempt to downplay the severity of the events of January 6, 2021, nor to minimize the historical significance of the violence and disruption in our nation's capital.  The fallout of January 6, 2021 will remain for some time to come.

Mr. Williams hopes to convey two points in this section.  First, Mr. Williams truly regrets becoming involved in such a large-scale event that caused violence and destruction.  His life up until January 6, 2021 had not involved any arrest, prosecutions, or conviction for any offense.  But for the application of USSG § 4C1.1(a)(3), Mr. Williams would qualify for an additional two-level reduction, resulting in an advisory guideline range of 18

to 24 months (based on a total offense level of 15 and a criminal history category of I).[1]

Respectfully, the intent behind the 2023 Amendment was to better calibrate sentences for offenders who "have considerably lower recidivism rates than other offenders." Amendment 821, Supplement to Appendix C (November 1, 2024), p. 241. When crafting exclusions to the reduction, the Commission looked to the "seriousness of the instant offense of conviction or the existence of aggravating factors in the instant offense". *Id*. at 242. As will be discussed in a moment, Mr. Williams' actions are not the type of violence or credible threats of violence truly at issue in the Guidelines. But more importantly, Mr. Williams' complete lack of criminal history warrants serious consideration of a downward variance in the spirit of the two-level reduction. His acceptance of responsibility and regret are real. There is no genuine risk of recidivism for Mr. Williams.

Second, Mr. Williams' actions are not the type of "violent assault" worthy of significant incarceration. Mr. Williams traveled to Washington, D.C., as many thousands of others did, to show political support. There is no evidence to suggest Mr. Williams traveled with the intent to disrupt the certification process or to otherwise wreak havoc. He came plain clothed and did not carry a flag. Unlike many, Mr. Williams did not come with protective gear, such as padding, helmets, goggles, backpack, or body armor. He did not carry a radio or pepper / bear spray.

---

[1] Mr. Williams has not objected to the lack of a two-level reduction under USSG § 4C1.1. *E.g.*, *United States v. Bauer*, 714 F.Supp.3d 1 (D.D.C. Jan. 29, 2024) (credible threats of violence barred reduction under USSG § 4C1.1 in the January 6 context).

The morning of January 6, 2021, Mr. Williams attempted to observe the speech at the Ellipse. As he recalls, he could not hear the speech because the acoustics were terrible at his location. He learned of others walking towards the Capitol and joined. Mr. Williams followed the crowd to the west side of the Capitol. He then pushed his way up to the front after seeing an older woman pushed. When he got to the front of the line, he remembers arguing back and forth with the officers.

The next few moments are memorialized in video form, from which the Court can draw its own conclusions. Mr. Williams submits he did not initiate contact with the police officer's shield to overwhelm him or to break the line (thereby permitting others to advance). As can be seen, Mr. Williams is behind another person who is aggressively shoving the police officer.

Others in the crowd are clearly looking to aggressively confront officers by throwing their weight into the shields, and in other cases, throwing punches. Mr. Williams felt the push of those behind him and he was face to face with a police officer using a clear shield. The video shows Mr. Williams, at times with one or two hands, pushing back and forth with the officer. Throughout this period of seconds, Mr. Williams is speaking with the officer, and does not appear to trying to overwhelm the officer. The video shows others pushing on Mr. Williams' back, causing him to be further pushed into the officer. Mr. Williams does not attempt to strike, hit, or injure the officer. He was between a line of officers pushing back and thousands of others behind him pushing forward. In a matter of moments, Mr. Williams was sprayed with pepper spray and he withdrew from the front line pushing. From that moment on, Mr. Williams did not physically confront another

officer. He did not try to enter the Capitol. He did not join others to try and force their way into the Capitol.

This distinction, while perhaps legally insignificant, is important. Mr. Williams was swept up the group action, including his conduct with the officer on the West Terrace. Certainly, he has been recorded saying aggressive comments. But Mr. Williams decided not to try and go inside the Capitol. For him, that was a bright line that was wrong. All around him, chaos erupted. He remained outside in the restricted area but had no further direct conflict with any members of law enforcement. In fact, he observed others breaking windows on the west side of the Capitol and he did his best to make them stop. Mr. Williams did not want the building damaged or looted.



*Mr. Williams arguing with individual over damage to the Capitol*[2]

---

[2] Despite hours of searching the discovery database, Counsel has been unable to find the video from which this screenshot was taken.

Mr. Williams did not violently strike or assault officers. He momentarily pushed back and forth with a single officer for a matter of seconds, at times due to the proximity of individuals behind him. Mr. Williams remained on the West Terrace, adding to the thousands of people disrupting the orderly conduct within and on the Capitol grounds.

Mr. Williams was not contacted about his participation in the January 6 events until much later. In fact, Mr. Williams reached out to a member of law enforcement when he learned he was being investigated through public source websites. That law enforcement contact put him in touch with an FBI Agent in San Angelo, Texas. Mr. Williams called the agent in January of 2022, with the intent of addressing his involvement head on. He never heard back. In August of 2023, Mr. Williams was arrested on a connecting flight, with media present. He made his initial appearance shortly thereafter.

Mr. Williams played a small role. To be sure, this small role, taken in the aggregate with the hundreds of others, contributed to the chaos and disorder resulting in the events of January 6. Mr. Williams has come to learn that even his minimal participation contributed towards a tumultuous and tragic event. He did not travel to Washington D.C. with the intent to storm the Capitol building or disrupt democracy. Mr. Williams regrets his actions and is ready to accept this Court's punishment.

Respectfully, such punishment need not be incarceration for the term suggested by the advisory guidelines.

*History and Characteristics of Mr. Williams*

Dustin Williams is the son of Pricilla Campbell and Leonard Williams. Mr. Williams' father was not around to raise Dustin. Rather, Mr. Williams (the elder) went to

prison when Dustin was young.  This was a black mark on the family, apparently from cattle theft.  Dustin Williams was primarily raised by his mother and his step-father, Robert Campbell.  Mr. Williams kept the family name in an attempt to "cleanse" it from the stigma relating to his father's history.  Up until the events of January 6, 2021, Mr. Williams successfully avoided his father's fate.

Mr. Williams grew up in small town Brady, Texas, known as the "heart of Texas." With a population of approximately 5,000, Mr. Williams enjoyed an average American life.  His mother worked in the local Fire Department, eventually becoming its first female Captain.  Mr. Williams lived a typical American male childhood, replete with sports and activities.

In high school, Mr. Williams became a father.  When only a sophomore, his daughter Rayliegh Williams was born.  Despite his young age, Mr. Williams stepped up to the responsibility of being a loving and present father.  He managed to remain in high school while helping to raise Rayliegh (who herself graduated high school with his support).  All the while, Mr. Williams was employed and a member of the football team.

As if this were not difficult enough, Mr. Williams also went through a tumultuous period.  His stepfather had started drinking too much and Mr. Williams bore the consequences.  It was during this time he met Matt Popnoe, his science teacher.  Mr. Popnoe intervened in Mr. Williams' life.  Mr. Popnoe became a mentor to Mr. Williams, helping to keep him focused on schoolwork and being a father.  Mr. Williams moved in with Mr. Popnoe while he sorted things out with his family.  As Mr. Williams reflects on it, he would not have graduated if it were not for Mr. Popnoe.

Years later, Mr. Williams learned Mr. Popnoe had a stroke and had previously granted Mr. Williams power of attorney. Mr. Williams was now called upon to make important life decisions for Mr. Popnoe. Knowing his friend and mentor did not want to be in a nursing home, Mr. Williams helped remodel his home and take care of him.



*Mr. Williams and Mr. Popnoe*



*Mr. Williams, family, and Mr. Popnoe*

In the intervening years, Mr. Williams had enlisted in the United States Army. He attended basic training in Ft. Benning, Georgia and then was stationed at Ft. Hood in the First Calvary Division. He was deployed in December 2010. Prior to deployment, he became married to Chasity Smith, the mother of Rayleigh. (PSR ¶ 72). During his deployment, Mr. Williams served in Iraq, tasked with counter patrols guarding the airfield and camp. He recalls being fired upon by mortars. At first, being fired upon was scary. It soon turned commonplace, almost fun. But Mr. Williams was shocked back into reality when he heard a mortar strike, and witnessed the aftermath, of the death of his battle buddy. On another occasion, Mr. Williams very likely sustained a traumatic brain injury. Mr. Williams was positioned in the turret within a Humvee on patrol. A driving error caused

it to flip over.  He lost consciousness.  When Mr. Williams regained consciousness, he thought he had simply fallen asleep.  A couple weeks later, Mr. Williams was back on patrol.

   While he was deployed, Chasity left him for another man in Arkansas.  Mr. Williams was honorably discharged on August 29, 2012.  The reason given was "parenthood."  He received the Army Commendation Medal, National Defense Service Medal, Iraq Campaign Medal with Campaign Star, Army Service Ribbon, and Overseas Service Ribbon.  Mr. Williams was back as a civilian in the United States.  He attended two semesters of college in Belton, Texas using the GI Bill.  It was not for him.  He then found himself working in the oil field for a period of time.  Mr. Williams remarried and had a son, Liam Williams, who is 10 years old.  Mr. Williams remains close with both of his children.




*Mr. Williams at his daughter's graduation*          *Mr. Williams and his two children*

   Later, Mr. Williams decided to learn the art of concrete from his father, Mr. Campbell.  He also used part of this GI Bill to attend a decorative concrete program in

Manchester, New Hampshire.  Mr. Williams has used his skills in decorative concrete in the years since, working both for himself and others.

In sum, Mr. Williams' history and characteristics support a sentence below the advisory guideline range.  He has absolutely no prior criminal history.  The circumstances of this case are wildly unique such that there is not a realistic chance he will reoffend.  His remorse and acceptance of responsibility are robust.  He has attached letters of support as Exhibit 1.

*Other Sentencing Factors*

The Court must impose a punishment that is "sufficient, but not greater than necessary," to effectuate the policy objectives of Congress in 18 U.S.C. § 3553(a) and "to comply with the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation." *Dean v. United States*, 137 S.Ct. 1170, 1175 (2017).  This "parsimony" clause is the "overarching provision" of the statute. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

Specific deterrence in this case does not appear to be a major factor.  Mr. Williams does not require incarceration to protect the public from further crimes committed by him.  However, general deterrence may be a concern for the Court.  The Court may want to impose a sentence that would deter future individuals from committing the same or similar conduct.  Respectfully, incarcerating Mr. Williams for a period as suggested by the advisory guidelines is not necessary to effectuate this sentencing objective.  His arrest, prosecution, and supervision have clearly indicated to the public that the United States Government will investigate and prosecute these actions.  He is now a convicted felon.

*Unwarranted Sentencing Disparities*

The Court is also required to consider the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(6). The unique nature of the January 6 prosecutions place the Court in a familiar position – attempting to mete out punishment comparable to other cases involving similar circumstances.

The following is a list of defendants with similar convictions. As the chart demonstrates, sentences of 24 to 30 months are reserved for much more serious conduct, often times involving the intentional hitting of officers or use of weapons. Other cases include deliberate and concerted efforts to break the line of police and encourage others to do the same. Many cases involve assaults and entry into the Capitol. Comparing these cases to that of Mr. Williams makes clear that a sentence within the advisory guideline range would result in an unwarranted sentencing disparity, particularly when he has no criminal history. Of course, this chart does not purport to place each defendant's criminal history in context, nor to discuss other differences.

| **Case number** | **Sentence received** | **Statement of offense** |
|---|---|---|
| Sherrill, Grayson 1:21-CR-00282-TSC | 7 months' incarceration 12 months' supervised release $2,000 restitution | Section 111(b) case in which defendant used a metal pole from broken barricades to swing at an officer wrestling with other rioters, and then entered the Capitol with the metal pole. (Doc. 104 at p. 4). |
| McNulty, Devin 1:23-CR-00235-TSC | 12 months and one day' incarceration 24 months' supervised release 60 hours' | Section 111(a)(1) case in which defendant climbed wall to reach upper west terrace, remained in North Door vestibule, pushed hands against riot shield multiple times to |

| | community service $2,000 fine | prevent forward movement (Doc. 27, pp. 3-4). |
|---|---|---|
| Mehaffie, David 1:21-CR-00040-TNM | 14 months' incarceration 24 months' supervised release | Section 111(a)(1) case in which defendant (according to Government's sentencing memorandum) perched over the Lower West Terrance tunnel entrance giving orders, directing movements, and coordinating the efforts of the mob to put officers at risk of severe harm.  (Doc. 526, pp. 1-2). |
| Brackley, Matthew 1:24-CR-00009-CJN | 15 months' incarceration 24 months' supervised release $1,000 fine $2,000 restitution | Section 111(a)(1) case in which defendant was among first to enter Capitol via Senate Wing Door, went to Crypt and Rotunda, confronted officers demanding to know where Speaker Pelosi's office was, instigated crowd to push through officers, pushed through officers, only dispersed after hit with chemical spray, spending in total about 40 minutes in building.  (Doc. 25, p. 4-5). |
| Shively, Barton Wade 1:21-CR-00151-JMC | 18 months' incarceration 36 months' supervised release $2,000 restitution | Section 111(a)(1) case in which defendant violently assault law enforcement by striking an officer's hand, head, and shoulder area, and grabbing another officer by his jacket and yelling at the officer.  (Doc. 46, pp. 3-4). |
| Capsel, Matthew 1:22-CR-00107-TSC | 18 months' incarceration 24 months' supervised release $2,000 restitution | Section 111(a)(1) case in which defendant encouraged members of the mob on the Lower West Terrance to hold the line, overtook the officers, and later confronted a line of National Guardsmen later that evening by pushing against their line, resulting in the deployment of pepper spray.  (Doc. 57, pp. 3-4). |

| | | |
|---|---|---|
| Dickinson, Michael 1:21-CR-00649-JDB | 20 months' incarceration 36 months' supervised release $2,000 restitution | Section 111(a)(1) case in which defendant threw what appeared to be a coffee tumbler at officer on the north side of the Capitol building, striking the officer in the face and chest, hitting a second officer, and also dumped a bucket of unknown liquid on officers protecting the building. (Doc. 28, pp. 3-4). |
| Hernandez, Joshua 1:22-CR-00042-CRC | 24 months' incarceration 36 months' supervised release $2,000 restitution | Section 231(a)(3) and 111(a)(1) case in which defendant carried a flagpole, traveled through the Senate Wing, Crypt, House floors, Speaker's hallway and conference room, and Rotunda, encouraging other rioters to join in a push against officers in the East Rotunda interior door, and eventually hitting officer on his helmet with the flagpole.  (Doc. 25, pp. 3-4). |
| Owens, Jason Douglas 1:21-CR-00286- BAH | 24 months' incarceration 34 months' supervised release $2,000 restitution | Section 111(a)(1) case in which defendant shoved officer hard enough to cause his head to snap back, attempted to grab different officer in attempt to make way through East Rotunda doors, also grabbing officer's baton.  (Doc. 100 at 3-4). |
| Weeks, James 1:24-CR-0131-BAH | 27 months' incarceration 36 months' supervised release $5,000 fine $2,774 restitution | Section 111(a)(1) case in which defendant entered the Lower West Terrace tunnel and fought against the police, including reaching his arm through a glass window to grab an officer, opened a door to permit other rioters access, struck an officer using his hands and body.  (Doc. 33, pp. 3-4). |
| Azari, Farhad 1:23-CR-0251-RCL | 30 months' incarceration 24 months' supervised release | Section 231(a)(3) and 111(a)(1) and (b) case in which defendant threw a water bottle at police, pushed against police in attempt to break a line, kicked an object at the direction of officers, picked up a flagpole and airhorn and threw the objects |

| | | |
|---|---|---|
| | | at officers, and eventually entered Capitol. (Doc. 59, pp. 3-12). |
| Slye, Mikhael 1:22-CR-334-JEB | 30 months' incarceration 18 months' probation $2,000 restitution | Section 111(a)(1) case in which defendant, clothed in a baseball helmet with a metal facemask, entered the Capitol building and exited, after which he deliberately threw a bicycle rack into the path of officers descending down a flight of stairs causing an officer to trip, fall down the stairs and suffer bodily injury. (Doc. 29, pp. 3-4). |

Mr. Williams' conduct is most comparable to that of Devin McNulty, Case. No. 23-cr-235 (TSC), who received a sentence of 12 months and one day.

Conclusion

Respectfully, Mr. Williams requests the Court impose a sentence significantly below the advisory guideline range.

Respectfully Submitted,

s/ *Kyle E. Wackenheim*
KYLE E. WACKENHEIM, OBA No. 30760
ASSISTANT FEDERAL PUBLIC DEFENDER
FEDERAL PUBLIC DEFENDER
WESTERN DISTRICT OF OKLAHOMA
215 Dean A. McGee Suite 109
Oklahoma City, Oklahoma 73102
Telephone: 405-609-5930
Telefacsimile: 405-609-5932
Electronic Mail: Kyle_Wackenheim@fd.org
Counsel for Defendant

**<u>CERTIFICATE OF SERVICE</u>**

     I hereby certify that on Tuesday, November 12, 2024, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic filing to Craig Estes, Assistant United States Attorney.

                          *<u>s/ Kyle E. Wackenheim</u>*
                          KYLE E. WACKENHEIM